**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **BRITTANY CHILDS,** | |
| *Plaintiff,* | |
| **v.** | |
| **MACON-BIBB COUNTY INDUSTRIAL AUTHORITY; MACON-BIBB COUNTY, GEORGIA; and LEVARN BRADFORD** *in her official capacity as the Former Operations and Finance Director and in her individual capacity,* | **CIVIL ACTION NO.** **5:18-cv-00328-TES** |
| *Defendants.* | |

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

African-American Plaintiff Brittany Childs alleges that Defendants LeVarn Bradford; the Macon-Bibb County Industrial Authority; and Macon-Bibb County, Georgia, violated her rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") by discriminating against her on the basis of her race and sex during her employment with the Macon-Bibb County Industrial Authority (the "Authority"). In short, Childs claims that she was fired from the Authority because she's black and because she's a woman, but the Authority contends that it fired her because she listened to a confidential

recording. With the benefit of discovery, Defendants filed two separate Motions for

Summary Judgment: the first by Defendant Macon-Bibb County, Georgia, and the

second by Defendants Bradford and the Authority. The Court addresses Defendants'

Motions in turn, and after review of the parties' arguments and applicable law, it

**GRANTS** each Motion. [Doc. 15]; [Doc. 22].

## FACTUAL BACKGROUND[1]

The Industrial Authority "was created pursuant to Article IX, Section VI,

Paragraph III of the Georgia Constitution." [Doc. 22-1 at ¶ 1]; [Doc. 18, Brown Depo., p.

55:4–19]. The Authority's Board consists of six members, one of whom is the Chair and

one of whom is the Vice Chair. [Doc. 22-1 at ¶ 2]. Until August 16, 2017, the Authority's

bylaws stated that the Chair would also serve as acting Executive Director of the

Authority and was in charge of its day-to-day operations, including the power to hire

and fire its employees.[2] [*Id.* at ¶ 3]; [Doc. 18, Brown Depo., pp. 14:10—15:5].

---

[1] Unless otherwise noted, the following facts come from the Authority's and Bradford's Statement of Material Facts Not in Dispute [Doc. 22-1].

[2] Childs "denies this statement as [the Authority and Bradford] stated" it. *See* [Doc. 34-3 at p. 5, ¶ 3]. In response to the Authority's and Bradford's Statement of Material Facts Not in Dispute, Childs claims that their "statements . . . violate Middle District of Georgia Local Rule 56 because they are not statements, but rather several statements which are incapable of being answered in the manner contemplated by the rules." [*Id.* at p. 1]. In hopes to clarify any confusion for future litigants, Local Rule 56 provides that a movant for summary judgment under Federal Rule of Civil Procedure 56 "shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record." LR 56, MDGa.

This local rule also states that

> [t]he respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate. The respondent to a motion for summary judgment may not assert insufficient knowledge to admit or deny a material fact asserted by the movant unless the respondent has complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure.

*Id.* Here, Childs, when denying many of the Authority's and Bradford's statements, does not specifically controvert them by "specific citation to particular parts of materials in the record." *See generally* [Doc. 34-3] *in connection with* [Doc. 22-1]. Additionally, when she "admits [a] statement in part," she, often, never tells the Court which portion of the statement she disagrees with, despite her ability to point out the relevant record evidence. *See* [Doc. 37 at pp. 2–3]. Thus, the Authority's and Bradford's statements to which Childs "denies" or "admits in part" without any specific citation to the record to controvert them are, in accordance with Local Rule 56, deemed admitted. LR 56, MDGa. In an effort to avoid any de facto admission, Childs states that she will "selectively respond" to the Authority's and Bradford's statements and contends that she "is not required to respond to [their] statement of alleged material facts" because, according to her, they are "nonconforming" and "unduly lengthy statement[s] under Rule 6.5." [Doc. 34-3 at pp. 3–4].

The Local Rules for the Middle District of Georgia do not have a "Rule 6.5"; therefore, the Court can only assume that Childs is referring to Uniform Superior Court Rule 6.5 for Georgia's superior courts. *See, e.g.,* [*id.* at pp. 2–4]. For three pages, Childs supplies the Court with completely irrelevant law. She cites to several state-court cases from the Georgia Court of Appeals that, due to their subject matter (discussions of undisputed material facts for state-court cases), are not binding on this court. [*Id.*]. This case is governed by the Federal Rules of Civil Procedure and the Local Rules for the Middle District of Georgia—not Georgia's uniform rules for proceedings in its state courts.

Moreover, even though the Authority's and Bradford's Statement of Material Facts Not in Dispute contains over 100 separately numbered paragraphs, they are "concise statement[s], . . . numbered separately[,] and [are] supported by specific citation to particular parts of materials in the record." LR 56, MDGa; *see also* [Doc. 22-1]. Just because the Authority and Bradford filed a statement of material facts that contained over 100 short, concise paragraphs, does not make it "unduly lengthy" or violative of Local Rule 56. [Doc. 34-3 at p. 4]. Clearly, specific citations to the record can be done because the Authority and Bradford provided those citations and complied with Local Rule 56, and Childs—although she contends otherwise—should have done the same. *See generally* [Doc. 22-1]. Just because Childs claims that the presentation of the Authority's and Bradford's Statement of Material Facts Not in Dispute "ma[de] it very difficult for [her] to respond," it does not erase her obligation to comply with this local rule and respond appropriately. [Doc. 34-3 at pp. 1–2]. Litigants, be they *pro se* or represented by competent counsel, do not have the luxury of ignoring procedural rules that might be difficult to follow.

From at least 2014 until his resignation in August 2017,[3] Cliffard Whitby served as the Authority's Chair and acted as its Executive Director. [Doc. 22-1 at ¶ 4]. At the time of Childs' hire, the Authority had two employees: Bradford, the Finance Director, and Stephen Adams, the Project Manager. [*Id.* at ¶ 5]; [Doc. 17, Childs Depo., p. 12:6–11; *see also* [Doc. 17, Childs Depo., p. 18:19–23 ("When [Childs] first got [to the Authority], it was [her], [Adams], and . . . Bradford.")]. Adams' responsibilities as a project manager required him to frequently work outside of the Authority's office, and, early in his employment, he also performed some administrative duties like preparation for bi-weekly meetings and minute keeping. [Doc. 22-1 at ¶ 5]; [Doc. 17, Childs Depo., p. 15:3–16].

When Childs applied to be Whitby's administrative assistant, he, Bradford, and Adams conducted a panel interview, and she began working with the Authority on April 1, 2014. [Doc. 22-1 at ¶¶ 6–8]; [Doc. 17, Childs Depo., pp. 11:22—12:5, 14:5–7]. At that time, Childs assisted Whitby, Bradford, and Adams from within the Authority's office on administrative matters such as: calendaring, scheduling, typing emails for Whitby, helping prepare the agenda for bi-weekly meetings, and keeping minutes. [Doc. 22-1 at ¶¶ 10, 12]; [Doc. 17, Childs Depo., pp. 14:8—15:16].

---

[3] In their Statement of Material Facts, the Authority and Bradford state that Whitby resigned "in August 2016"; however, this is clearly a scrivener's error as the timeline for this case clearly shows that Whitby resigned following his indictment in August 2017. *Compare* [Doc. 22-1 at ¶ 4] *with* [Doc. 22-1 at ¶ 21]; *see also* [Doc. 19, Whitby Depo., pp. 11:23—12:1 ("I resigned as . . . [C]hairman . . . in 2017 . . . .")].

In February 2017, Whitby promoted Childs from Administrative Assistant to Administrative Coordinator. [Doc. 22-1 at ¶ 13]; [Doc. 17, Childs Depo., pp. 16:24—17:2]. Unlike the Administrative Assistant position that kept Childs within the Authority's office, the Administrative Coordinator position placed her in "more of an outside role" in which she continued to assist Adams, but would also "go to different meetings within the community [and] meet with different community stakeholders[.]" [Doc. 17, Childs Depo., p. 17:12–24]. Since no one filled the Administrative Assistant position, Childs's duties remained administrative in nature as indicated by her deposition testimony that she "[took] notes" in the various meetings she attended and kept the minutes for "every executive session meeting." [Doc. 22-1 at ¶¶ 15–16]; [Doc. 17, Childs Depo., pp. 17:12—18:5, 51:11–15].

However, on August 10, 2017, a federal grand jury indicted Whitby on conspiracy and bribery charges. [Doc. 22-1 at ¶ 21]; Indictment, *United States v. Whitby*, No. 5:17-cr-00043-MTT-CHW-1 (M.D. Ga. Aug. 10, 2017), ECF No. 1. Soon after, Whitby resigned his position with the Authority, and Robby Fountain, Vice Chair of the Board, automatically became acting Chair and was officially voted in as Chair at the start of a specially called meeting on August 16, 2017. [Doc. 22-1 at ¶¶ 22, 24–25].[4] During that

---

[4] Childs argues, and to some extent she's correct, that Whitby's indictment is not relevant to this case. While his indictment is not *legally* relevant to the discrimination issues before the Court, it is *factually* relevant to show why Whitby resigned his position as Chair and Executive Director of the Authority and how Fountain assumed the Chairmanship. [Doc. 34-3 at ¶ 21].

meeting, the Board "went into executive session to discuss personnel, and all staff, including [Childs], were excused."[5] [*Id.* at ¶ 26]; [Doc. 17, Childs Depo., pp. 46:16—47:9]. Since Childs and other staff members were asked to leave, Childs, as usual, "slid the recorder" that she normally used to record meetings in order to draft minutes, to Kevin Brown, outside general counsel for the Authority. [Doc. 22-1 at ¶¶ 27, 29, 31, 35]; [Doc. 17, Childs Depo., pp. 15:7—16, 45:20—46:10 ("Usually if staff was asked to leave, [Childs] would slide [the recorder] over to [Brown] . . . .")]; [Doc. 18, Brown Depo., pp. 4:24—5:4]. Whenever staff was asked to leave, Childs unequivocally testified that "[Brown] would be responsible for the recording." [Doc. 17, Childs Depo., p. 46:8–10]. However, later in her deposition, Childs also testified that when the Board went into executive session, she would still "take the notes and write up the minutes for that portion of the meeting," "even if [the minutes] included personnel [discussions]," because that "was the practice" and was what "[Whitby] charged her with doing." [*Id.*

---

[5] Childs apparently takes issue with the Authority's and Bradford's statements regarding executive sessions. Childs denied each of those statements on the grounds that "she . . . prepared" the agenda for the meeting that was to take place on August 16, 2017, and "there was no executive session on [it]." [Doc. 34-3 at ¶ 26]; *see also* [Doc. 18, Brown Depo., p. 12:6–9 ("Generally, at that time, [Childs] prepared agendas, but I thought she was out of town at some point. I'm not sure who prepared that agenda, if it was [Bradford] or [Childs] with [Bradford]. I'm not sure.")]. She also denies these statements on the assertion that "[she] took all of the executive session and closed session minutes after she started." [Doc. 34-3 at ¶ 28]. Regardless of who prepared the agenda or whether it contained a timeslot for an executive session, Childs testified at her deposition that even though she was normally present during executive session meetings to, as she stresses, take minutes, she was "[n]ot [for] this one[,]" because she, Bradford, Adams, and two other staff members were asked to leave. [*Id.*]; [Doc. 17, Childs Depo., pp. 43:1–8, 45:15–19].

at p. 47:17–23]; [Doc. 19, Whitby Depo., pp. 31:12—32:3]. Whitby verified this in his deposition. [Doc. 19, Whitby Depo., pp. 31:12—32:3].

What is not in dispute is that Childs and other staff members were asked to leave the room so that the "highly confidential," executive session discussions regarding personnel matters could begin. [Doc. 22-1 at ¶ 32]; [Doc. 17, Childs Depo., p. 42:11–14, 17–19]. This seems to the onus of the confusion in this case. On one hand, Childs claims she would write the executive session minutes "even if [they] included personnel." [Doc. 17, Childs Depo., p. 47:17–18]. And on the other hand, the Authority and Bradford maintain that when Brown wrote the executive session minutes that concerned personnel, Childs knew "from her training and work experience that she was not allowed to listen to minutes" once she "had been excused from executive session." [Doc. 22-1 at ¶ 34].[6]

Here, what is important was whether Childs, in keeping with Whitby's "practice," would be the staff member tasked with listening to the recording of the highly confidential executive session meeting in order to draft its minutes. [*Id.*]; [Doc.

---

[6] *See, e.g.*, [Doc. 18, Brown Depo., pp. 24:14–18, 32:21–25 (first discussing Childs' work experience: "[W]hen you're excused from a portion of a personnel meeting, and it's very rare for [Childs] to be excused, she was not excused often. When she was excused, she knew . . . that the tape was with [Brown], and she knew she would not take those portion [*sic*] of the minutes. [Brown] would take those minutes." and then explaining Childs' reason for termination: "'Personnel who are the subject of executive session discussions of the Authority and who are excused from the discussions are not allowed to . . . hear the discussions.'")].

Although Childs states that she didn't know it, her "desire to take classes at Georgia State in Atlanta" was "one item on the agenda" for the executive session. [Doc. 17, Childs Depo., pp. 43:12–17, 45:12–14].

19, Whitby Depo., p. 31:25]. However, from Whitby's deposition testimony, the question of whether Childs would have been allowed to listen to this specific executive session recording in order to draft the minutes as a matter of "practice," is less clear. Whitby testified that "[o]nce [he] cleared [the minutes]," presumably drafted by Childs, he "ran them by [Brown]." [Doc. 19, Whitby Depo., p. 32:7–12]. According to Whitby, "Childs did all the executive session minutes *when [he] was chairman* . . . even the [meetings] where the staff left the room." [*Id.*] (emphasis added).

Sure, Childs may have listened to recordings of executive session meetings *when Whitby was Chairman*, but if you recall the date of his indictment, followed by his resignation, Whitby was not the Authority's Chair on August 16, 2017, when the Board held the executive session at issue. Thus, this case doesn't hinge on what Whitby had previously prescribed as "the practice" for Childs' responsibilities when he was Chair. Instead, it hinges on whether Childs had the authority to, after Whitby's resignation, listen to the recording of the executive session meeting on August 16, 2017.

So, what happened after that executive session meeting? Just like at the end of "every [other] executive session meeting," Childs testified that she "would collect all the iPads and bring them back to [her] office[ ] and start on the minutes." [Doc. 17, Childs Depo., p. 51:11–15]. Now, there seems to be some dispute as to how the recorder ended up in Childs' hands. According to Brown, after the meeting ended, the recorder was "sitting next to [him,] and [Childs] came over and . . . reached for it as she would

normally do," but, this time, Brown instructed Childs to "leave it with [him]." [Doc. 18, Brown Depo., p. 10:5–9]. Then, by Brown's account, Childs' stated that she was going to "get it off the table," and "[t]hen she left" with the recorder. [*Id.* at p. 10:9–10]. Childs' account is, of course, a little different. She testified that Brown "slid [the recorder] back to [her]." [Doc. 17, Childs Depo., 51:7].

Then, according to Childs, Brown came into her office where, she admits, she was listening to the recording of the executive session. [*Id.* at pp. 51:23—52:3]; [Doc. 22-1 at ¶ 34]. Once Brown confronted her about listening to the executive session recording, Childs, who believed that her actions were permissible[7] because of what Whitby had

---

[7] Regardless of whether Whitby (when he was Chairman) allowed Childs to listen to the executive session recordings so that she could prepare the minutes is of no legal consequence. When Fountain became Chair, he did not have to continue that practice. And whether there was any oral or written policy created in a matter of minutes (once Fountain assumed the Chairmanship) stating that Childs could no longer listen to those recordings is also legally irrelevant. *See* [Doc. 34-9, Childs Aff., ¶ 10].

Childs contends, in her affidavit, that the Authority's reason for her termination (listening to the confidential recording) "was a fabricated or false reason since it occurred after [she] had already been terminated." [*Id.* at ¶ 9]. The contents of her affidavit, however, are in direct conflict with her deposition testimony, and it is well established that a party cannot create a genuine issue of material fact by simply controverting previous testimony. *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). To the extent she presents these arguments in an attempt to show pretext, they fail. Fountain, as the Authority's Chair, could have fired Childs for a bad reason, an unwise reason, or no reason at all. As unfair as this may seem, it is the law, and as long as Childs wasn't fired because of her race or sex, the reason for her termination simply doesn't matter in this race and sex discrimination case. *See* n.18, *infra*.

previously allowed, repeatedly said, "I only listened to [two] seconds. I only listened to [two] seconds." [Doc. 17, Childs Depo., p. 52:13–21]; [Doc. 22-1 at ¶ 46]. Noticing that the recorder was sticking out of Childs' computer, Brown "snatched it from the computer[,]" and "left her office" to inform Bradford that Childs "was listening to the personnel minutes." [Doc. 17, Childs Depo., p. 53:3–4]; [Doc. 18, Brown Depo., p. 19:9–23]. Moments later, Brown once again asked Childs, this time with Bradford and Fountain present, if she listened "to the personnel portion of the minutes regarding the [B]oard's discussion of personnel matters." [Doc. 18, Brown Depo., p. 20:1–2]. Again, Childs admitted that she did. [Doc. 17, Childs Depo., pp. 53:23—54:1].

After Childs "admitted to listening to a portion of the personnel minutes" with Fountain, Bradford, and Brown "in the room," Brown looked at Fountain, and Fountain asked for Brown's recommendation as the Authority's outside general counsel. [Doc. 18, Brown Depo., p. 22:8–12]. Brown stated, "[W]ell, I think that this would be a terminable offense. It's your decision." [*Id.* at p. 22:12–13]; [Doc. 22-1 at ¶ 47]. Fountain, the newly-elected Chair of the Board, took counsel's advice and terminated Childs, and Bradford "stood up, consoled her and hugged her[,] [and Brown] told her . . . she could

---

As discussed in greater detail below, Childs cannot establish a prima facie case of race or sex discrimination because she cannot point to a similarly-situated comparator, and if she can't make out a prima facie case, then the Court never moves to the pretext stage. *See* Discussion, Section (C)(2), *infra*. Failure to establish a prima facie case is not the end-all-be-all for discrimination cases, as a plaintiff can present facts that would allow a jury to make an inference of inference of discrimination under the well-known convincing mosaic theory. Childs, however, never relied on this theory; thus, the Court need not address it either.

leave to go ahead and clear her desk out." [Doc. 25, Fountain Depo., pp. 5:4–5, 7:22–25, 8:8–10]; [Doc. 22-1 at ¶ 25].

In light of her termination, Childs filed this lawsuit alleging claims of race and sex discrimination and retaliation. *See, e.g.*, [Doc. 1 at ¶ 34]. Childs' retaliation claim stems from allegations of misconduct by Fountain. Apparently, according to Childs, Fountain called her after business hours twice, asked if she was home, and then asked if he could come over. [Doc. 17, Childs Depo., p. 34:14–22]; [Doc. 22-1 at ¶ 64]. On another occasion, Childs testified that while she "was setting up the conference room with iPads . . . [she] was bent over . . . and [Fountain] . . . put[ ] his leg behind [her] leg." [Doc. 17, Childs Depo., pp. 34:23—35:3]. She claims she reported this incident to Bradford and Whitby, but Fountain "emphatically denies [that] either of these actions ever occurred." [*Id.* at p. 35:4–5]; [Doc. 22-1 at ¶ 66 (citing [Doc. 25, Fountain Depo., pp. 12:21—13:24])].

Under these facts, as well as the record evidence as a whole, the Court first rules on the Motion for Summary Judgment [Doc. 15] filed by Macon-Bibb County, and then addresses the Authority's and Bradford's Motion for Summary Judgment [Doc. 22].

## DISCUSSION

### A.   Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[8] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437–38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings."

---

[8] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### B.   Macon-Bibb County's Motion for Summary Judgment

The question of whether a defendant meets the statutory definition of "employer" under Title VII is a threshold jurisdictional matter. *Lyes v. City of Riveria Beach*, 166 F.3d 1332, 1340 (11th Cir. 1999) (en banc) (citation omitted). Before any plaintiff's Title VII claims can be considered, she must show that her "employer" had 15

or more employees for the requisite period prescribed by the statute. *Id.* at 1340–41; *see also Harvey*, 2016 WL 393997, *infra*.

Childs named Macon-Bibb County as a defendant because she "believe[s]" it is a joint employer with the Authority. [Doc. 17, Childs Depo., p. 137:15–17]. She clearly did so in an effort to salvage any potential Title VII claim she may have against the Authority. If she can aggregate Macon-Bibb and the Authority as a single or joint employer, she will have satisfied the 15-employee jurisdictional requirement for Title VII cases.

In briefing, Childs adamantly argues that because she *testified* that the Authority "is an arm of Macon-Bibb [C]ounty" and "provide[d] examples" about a joint-employer relationship (such as receiving her paycheck, healthcare, and retirement benefits through Macon-Bibb, and Macon-Bibb's funding to the Authority), she has established that status as a fact.[9] [Doc. 34-2, Childs Aff., ¶ 2]; *see also* [Doc. 17, Childs Depo., pp. 131:13—132:6]. Not so.

Childs also takes a firm stance that the statements of her affidavit should be accepted by the Court as fact because they are "based on her personal knowledge and observation of the facts that she swears to." [Doc. 39 at p. 4] (emphasis omitted). Again,

---

[9] But, in those same briefs, she admits that such a label is "her contention." [Doc. 17, Childs Depo., pp. 131:19—132:2]; [Doc. 39 at p. 5 ("[Childs] also testified that [the Authority] and [Macon-Bibb] were joint employers on page 113 of her deposition and provides examples and other information *to establish her contention*.")] (emphasis added).

this is not how it works. Certainly, Childs can testify all she wants that *she contends* that Macon-Bibb and the Authority are her joint employers, but such testimony—no matter how much someone believes it and wants it to be true—doesn't make it legally so. Simply put, Childs wants the Court to deem the Authority and Macon-Bibb as her joint employers because she "swears" they are. [*Id.*]. The Court, however, cannot place a "joint-employer" label on an entity without deference to the law that established it. That is precisely why Macon-Bibb argues that Childs' claims against it should be dismissed—because it is not her employer or joint employer. [Doc. 15-3 at pp. 7–12].

As previously alluded to, the Authority was created by a provision of the Georgia Constitution that is separate and distinct from the provision that permitted the governmental restructuring of the City of Macon and Bibb County, Georgia, into a single, consolidated local government. *Compare* Ga. Const. art IX, § VI, ¶ 3, *and* Ga. Const. art. IX, § III, ¶ 2. In fact, the creation of the Authority predates the creation of the consolidated government of Macon-Bibb County by over 50 years. In 1962, the Georgia General Assembly "created a public body corporate and politic in the County of Bibb to be known as the 'Macon-Bibb County Industrial Authority,' which shall be an instrumentality[10] of the City of Macon and of the County of Bibb, and which is sometimes hereinafter referred to as 'The Authority.'" Ga. L. 1962, p. 2323; A GALILEO

---

[10] "A means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Instrumentality*, Black's Law Dictionary (10th ed. 2014).

Initiative Database, Georgia Legislative Documents,

http://neptune3.galib.uga.edu/ssp/cgi-bin/legis-

idx.pl?sessionid=7f000001&type=law&byte=260490339&lawcnt=82&filt=doc (last visited

May 27, 2020). Then, on January 1, 2014, the Macon-Bibb County consolidated

government began. [Doc. 15-1 at ¶ 3]; [Doc. 33-3 at p. 5, ¶ 3].

     Using the tests set out in *Peppers v. Cobb Cty.*, 835 F.3d 1268 (11th Cir. 2016), the

Court concludes that Macon-Bibb and the Authority are neither a single employer nor

Childs' joint employers.[11] To make this determination, the Court looked to one general

premise: which entity—the Authority or Macon-Bibb—controlled "the fundamental

aspects of the employment relationship that gave rise to the claim." *Peppers*, 835 F.3d at

---

[11] In researching the ultimate issue of whether Macon-Bibb and the Authority are joint employers for this case, the Court came across a case from the Georgia Court of Appeals that presents an interesting evaluation of the entities' relationship to one another. Candidly, this case was not discussed by any party, but because of the substantial assistance it provides to resolve the joint-employer contention, the Court felt that it warranted some discussion.

In 1989, some 25 years *before* the City of Macon and Bibb County consolidated their governments, the Georgia Court of Appeals held that the stand-alone, pre-consolidated City of Macon and the Authority were "privies" under Georgia's Civil Practice Act for res judicata purposes. *City of Macon v. Pasco Bldg. Sys.*, 380 S.E.2d 718, 719 (Ga. Ct. App. 1989). Initially, their status as "privies" might seem to imply that Macon-Bibb, as it is today, and the Authority are somehow joined at the legal hip; however, upon a closer reading of *Pasco*, that simply isn't the case.

What *Pasco* really reveals for our inquiry, is the clear and evident separation between the local government and the Authority. Reading between the lines, *Pasco* dealt with the City of Macon's ability to contractually recover for losses to its property that *it leased to the Authority*. That's right, the City of Macon entered into a lease agreement *with* the Authority. The contractual relationship presented in *Pasco* belies any reasonable conclusion that they are legally one in the same, or as Childs' contends, "alter-egos" of one another. [Doc. 1 at ¶ 16]. The City of Macon and the Authority had a lease agreement with each other that the Georgia Court of Appeals, by its holding in *Pasco*, implicitly recognized. So, it is clear that Georgia's courts acknowledged a distinction between the two entities.

1297 (quoting *Lyes*, 166 F.3d at 1345). This general premise requires a specific consideration of the totality of the employment relationship: namely, how much control Macon-Bibb, as the alleged employer, exerted on Childs and whether Macon-Bibb had the power to hire, fire, or modify the terms and conditions of her employment. *Peppers*, 835 F.3d at 1297 (first citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995) and then citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998)).

For years, it has been established in this circuit that "[g]overnmental subdivisions such as counties or towns, or smaller subdivisions such as local agencies, may share sources of ultimate political control or funding, yet be wholly distinct with respect to their day-to-day operations or their control over relationships with employees." *Lyes*, 166 F.3d at 1343. The Eleventh Circuit Court of Appeals has clearly held that "great deference" should be given to federalism and comity concerns. *Id.* at 1343–44. Specifically, when states create subordinate public bodies, "the state is supreme and its legislative body, conforming its action to the state Constitution, may do as it will" in defining the state's relationship to the subordinate body. *Id.* (quoting *City of Trenton v. New Jersey*, 262 U.S. 182, 186–87 (1923)).

Here, it is beyond reasonable dispute that Macon-Bibb and the Authority are legally distinct governmental entities. As previously noted, both the Authority and Macon-Bibb are creatures of Georgia's constitution. Macon-Bibb has its own "board"— the county commission—and so does the Authority. As for Childs' termination, the

evidence demonstrates that Fountain, as Chairman, terminated her. [Doc. 20, Bradford

Depo., p. 22:7–17]. When it comes to terminating an employee, "the board did not have

to take a vote," termination "was done through the immediate supervisor, or the

[C]hairman, or [V]ice [C]hairman, and [here], the [C]hairman terminated [Childs]." [*Id.*

at p. 22:18–21]. Most notably, Childs does not even contend that Macon-Bibb, itself, did

anything to serve as the basis for her claims. [Doc. 17, Childs Depo., p. 137:8–17].

Instead, Childs seemingly only named Macon-Bibb as a defendant based on her

contention that it and the Authority are her joint-employers, ostensibly in an attempt to

reach the 15-employee requirement for Title VII cases. [*Id.*]; *see also* [Doc. 15-3 at p. 9].

What's more, Childs testified that Bradford, along with Whitby, would conduct

her performance evaluations, not anyone from Macon-Bibb. [Doc. 17, Childs Depo., p.

116:6–23]. The decision to promote Childs in February 2017 was Whitby and Bradford's

decision, not anyone's from Macon-Bibb. [*Id.* at pp. 16:24—17:2]; [Doc. 20, Bradford

Depo., p. 60:16–18]; [Doc. 19, Whitby Depo., p. 19:19–25]. No one from Macon-Bibb had

any involvement in Childs' day-to-day activities and work assignments. [Doc. 18,

Brown Depo., p. 52:18–22]. If Childs needed time off from work, Bradford would

authorize that request, not anyone from Macon-Bibb. [Doc. 20, Bradford Depo., p.

61:14–18]. And finally, no one from Macon-Bibb authorized Childs' pay raises—Whitby

did. [*Id.* at p. 61:19–20]. All in all, Macon-Bibb had nothing to do with any aspect of

Childs' work, performance evaluations, compensation, or termination. [Doc. 18, Brown

Depo., p. 52:18–22]. This, then, would seem to end the joint-employer inquiry; but as always, certainty in the law is always the best route.

"Affording the term 'employer' the liberal construction it is due," there are instances where the Eleventh Circuit Court of Appeals has "looked beyond the nominal independence of an entity and asked 'whether two or more ostensibly separate entities should be treated as a single, integrated enterprise when determining whether a plaintiff's "employer" comes within the coverage of Title VII.'" *Peppers*, 835 F.3d at 1298 (quoting *Lyes*, 166 F.3d at 1341). There are three circumstances where this type of aggregation may be possible.

> First, where two ostensibly separate entities are highly integrated with respect to ownership and operations, we may count them together under Title VII. This is the "single employer" or "integrated enterprise" test. Second, where two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as "joint employers" and aggregate them. This is the "joint employer" test. Third, where an employer delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer and aggregate the two when counting employees.

*Id.*

Let's begin with the single-employer test, bearing in mind the significant degree of deference afforded to the Georgia legislature when it created the Authority. *Id.* (quoting *Lyes*, 166 F.3d at 1344). If a fact finder could reasonably conclude that Childs has clearly overcome the presumption that the Authority and Macon-Bibb are separate,

then the two entities will be considered a single employer for purposes of Title VII. *Id.* (quoting *Lyes*, 166 F.3d at 1345). This presumption, however, is "only overcome with *strong evidence*," and *Lyes* prescribed "two ways to rebut the presumption against aggregating separate government entities." *Id.*

Childs may first try and rebut this presumption by presenting evidence that the Authority "was created or maintained for the purpose of evading the federal employment discrimination laws." *Id.* (quoting *Lyes*, 166 F.3d at 1344). Second, if no evasive purpose is present, then Childs may offer evidence that would allow a reasonable fact finder to conclude that the presumption is clearly outweighed by "factors manifestly indicating that" the Authority and Macon-Bibb "are so closely interrelated with respect to control of the *fundamental* aspects of the employment relationship that they should be counted together under Title VII." *Id.* (quoting *Lyes*, 166 F.3d at 1345). Relevant factors include: "centralized control of operations; authority to hire, transfer, promote, discipline, or discharge; authority to establish work schedules or direct assignments; and the obligation to pay the plaintiff." *Id.*

Here, there is a presumption, just from the basic constitutional construct of these two governmental entities, that the Authority and Macon-Bibb are legally distinct from one another. Sure, the Authority may receive the funds by which it pays Childs' salary, but the Eleventh Circuit Court of Appeals has already observed that "the source of a governmental entity's funding is a poor indication of whether it should be aggregated

20

with another." *Id.* quoting *Lyes*, 166 F.3d at 1346, n.10). All things considered, however, it is clear that Childs has not met the *Lyes* standard for aggregating the Authority and Macon-Bibb as a "single employer." There is nothing in the record—nor does Childs ever argue differently—that the Authority was created as a "means to evade federal employment discrimination law" under Title VII. And, in actuality, she can't. No one can credibly argue that the Authority was created for the evasion of Title VII's requirements because it existed *before* Congress passed Title VII in 1964. Moreover, as discussed earlier, no one from Macon-Bibb controlled the fundamental aspects of Childs' employment or her termination to "manifestly indicate[ ] that the two entities are so closely interrelated that they should be considered as being one entity." *Id.* at 1299 (citing *Lyes*, 166 F.3d at 1345); *see also* [Doc. 33-1 at pp. 7–8].

Instead, Childs erroneously argues that *Peppers* is inapplicable to her case because it dealt with "a state entity," a district attorney's office, "that was not created by the county." [Doc. 33-1 at p. 7]. *Neither was the Authority.* Despite all the evidence in the record, as well as her own reliance (for her instrumentality-based contention, *see, e.g.* [Doc. 34-2, Childs Aff., pp. 1–2, ¶ 2]) on the very law that established the Authority, Childs still contends that Macon-Bibb created the Authority. [*Id.*]; *see also* [Doc. 20, Bradford Depo., pp. 165–172]. This simply isn't true. The Georgia General Assembly created the Authority in 1962, not Macon-Bibb, or Bibb County as it existed in 1962. Ga. L. 1962, p. 2323, *supra*.

21

Second, Macon-Bibb and the Authority may be aggregated if they are joint employers. Joint employers exist "where two entities contract with each other for the performance of some task, and one company retains sufficient control over *the terms and conditions of employment* of the other company's employees[.]" *Peppers*, 835 F.3d at 1298 (citation omitted). Unlike a "single employer" analysis, which can erase the state-intended distinction,[12] a "joint employer" relationship, if shown, will recognize the distinction, but ultimately leads to the conclusion that the two entities "collaborated jointly to employ an individual." *Id.* at 1299.

Determining whether two entities acted as a "joint employer" is relatively straightforward.

> The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus[,] the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Id.* at 1300 (quoting *Virgo v. Riviera Beach Assoc.*, 30 F.3d 1350, 1360 (11th Cir. 1994)).

Most notably, there is nothing in the record to indicate that Macon-Bibb and the

---

[12] Because a "joint employer" finding does not completely disregard the state's decision to separate its governmental subdivisions, the concerns of comity and federalism are lessened in this analysis. *Peppers*, 835 F.3d at 1299. "That said, the concerns regarding comity and federalism do not completely vanish. Indeed, even when considering whether two governmental subdivisions are joint employers, we must remain mindful of the state's expressed determination that the agencies and subdivisions of government are divided and separated." *Id.* While the the degree of deference set forth in *Lyes* need not be afforded, courts are still "well-advised to act with care and circumspection before aggregating separate state actors as joint employers." *Id.* at 1299–1300.

authority "contract with each other for the performance of some task." *Peppers*, 835 F.3d

at 1298 (quoting *Lyes*, 166 F.3d at 1341). Thus, our joint-employer inquiry would seem to

be at an end. However, in order to be thorough, the Court continues with its analysis.

In keeping with the "total employment situation," *Welch*, 57 F.3d at 1011, the

Eleventh Circuit Court of Appeals noted that a "joint employer" determination is

employee-specific, resting focus on the individual employee (or class of employees) as

opposed to the particular aspects of employment. *Peppers*, 385 F.3d at 1300 (citing

*Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004)). In other words, the

"single employer" test "looks at the overall relationships of the two entities," whereas

the "joint employer" status will be determined "by focusing on the entities'

relationships to a given employee or class of employees." *Peppers*, 825 F.3d at 1300.

Without rehashing the fact that Macon-Bibb did nothing to control the

fundamental aspects of Childs' employment or her termination, it is clear that she has

not "adduced any evidence to establish that" Macon-Bibb and the Authority acted as

"joint employers" with regard to her total employment situation. *Id.* In fact, the only

involvement Macon-Bibb had with the Authority "was essentially to act as a

paymaster." *Id.* Macon-Bibb's role, as it pertained to Childs' employment, consisted

solely of issuing Childs a paycheck and administering healthcare and retirement

benefits. [Doc. 17, Childs Depo., pp. 131:13―132:2]; [Doc. 18, Brown Depo., p. 53:15–20

(confirming that "[o]ther than the option of Macon-Bibb County Industrial Authority

employees to participate in [a] benefits program and the fact that Macon-Bibb . . . cut

paychecks as a payroll administrator, there was no further involvement in . . . Childs'

employment . . .")].[13]

Even considering the fact that Macon-Bibb controlled the purse strings for the

Authority, it was still the Authority (or Whitby, rather) who decided Childs' salary.

[Doc. 20, Bradford Depo., p. 61:19–20]. Macon-Bibb, like the county government in

*Peppers*, would not change Childs' salary unless the Authority, through Whitby,

requested such a change. 835 F.3d at 1300–01. "Moreover, recognizing two distinct

governmental agencies or subdivisions as joint employers for purposes of

compensation, but not for the purposes of hiring, firing, supervising, or anything else

seems patently wrong." *Id.* at 1301. Looking at Childs' total employment situation, she

has failed to present a material fact in dispute because the evidence simply does not

support her sweeping legal conclusion that the Authority and Macon-Bibb acted as her

joint employer.

The third and final possibility for aggregation exists where an employer

delegates sufficient control of some traditional rights over employees to a third party,

which may be treated as an agent of the employer when counting employees to meet

Title VII's 15-employee requirement. *Id.* at 1298. Here, there is nothing in the record to

---

[13] As to payroll administration, the Court notes Brown's testimony that about "a year or so ago," which would've been around mid-to-late 2018, the Authority began using a "private payroll company." [Doc. 18, Brown Depo., pp. 1, 53:20—54:7].

even remotely conclude that the Authority gave Macon-Bibb sufficient control of Childs' traditional employee rights. To the contrary, other than payroll and employee benefits, as just discussed, the Authority gave nothing to Macon-Bibb when it came to Childs' employment. Apparently, however, Macon-Bibb possesses the ability to "pass rules and regulations for the Authority," but that is all that is revealed or shown to the Court. [Doc. 18, Brown Depo., p. 56:8–15]. Childs never expounds upon this. She never explains what sort of rules and regulations Macon-Bibb passes for the Authority; how frequently these occur; and to what extent, if any, they apply to an individual's (or, most importantly, to her) employment with the Authority. Without answers to these questions, the Court has absolutely no way to determine if these rules and regulations concerned Childs' "traditional employee rights," and that is what is needed in order to aggregate these two government entities as one.

Quite simply, a close examination of Childs' employment relationship establishes that the Authority employed her. Macon-Bibb was not and cannot be considered a "joint employer" notwithstanding the fact that it "provided paymaster, administrative, and budgetary functions" for the Authority. Consequently, Childs' claims against Macon-Bibb fail as a matter of law because it was not her employer or joint employer. Accordingly, the Court **GRANTS** Defendant Macon-Bibb County's Motion for Summary Judgment [Doc. 15].

C.  **The Authority's and Bradford's Motion for Summary Judgment**

1.  **Childs' Discrimination Claims Against Bradford**

Right out of the gate, the Court can easily dispense with Childs' claims asserted

against Defendant LeVarn Bradford. First, Title VII workplace discrimination claims can

only be brought against employers, not individual employees[14] as agents of the

employer. *Peppers*, 835 F.3d at 1297; *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006)

("[R]elief under Title VII is available against only the employer and not against

individual employees whose actions would constitute a violation of the Act, *regardless*

of whether the employer is a public company or a private company.").

Second, Childs' claims under 42 U.S.C. §§ 1981 and 1983 brought against

Defendant Bradford in her official capacity are redundant because she asserted identical

claims against the Authority. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)

("In contrast to individual capacity suits, when an offic[ial] is sued under [§] 1983 in . . .

her official capacity, the suit is simply another way of pleading an action against an

entity of which [the official] is an agent."). Third, Defendant Bradford enjoys qualified

immunity with respect to Childs' § 1981 and § 1983 claims asserted against her in her

individual capacity. Not only was there not any violation of a clearly established right,

as discussed below, Bradford did not even make the decision to terminate Childs—

---

[14] Childs even concedes this claim against Bradford. In briefing, Childs states that "Bradford[ ] cannot be held liable under Title VII in her individual capacity." [Doc. 34-1 at p. 14].

Fountain did, on the advice of counsel. [Doc. 20, Bradford Depo., p. 22:18–24]. The only role Bradford played in Childs' termination was completing the discharge paperwork. [*Id.* at p. 67]. However, Childs "believe[s]" that because Bradford signed her separation notice, she was the one who fired her. [Doc. 17, Childs Depo., pp. 26:2—27:14]. To the extent that, based on this belief, Childs hopes to invoke a "vicarious liability" theory for Bradford, as her supervisor, such a theory would fail for the simple fact that Bradford did not make the decision to terminate her.[15] It ought to be axiomatic that Bradford's performance of this job-related duty cannot render her labile for Childs' discrimination claims. Accordingly, all claims against Defendant Bradford are dismissed. *See* nn.19–21, *infra*.

### 2. Childs' Discrimination Claims Against the Authority

Now, all that remains is a discussion of Childs' claims against the Authority. As mentioned above, Childs contends that the Authority and Macon-Bibb were her joint employers. *See, e.g.*, [Doc. 17, Childs Depo., p. 137:8–17]. Aside from this, she points to nothing that Macon-Bibb did wrong to support her claims, and, as Defendants argue, her reason for naming Macon-Bibb as a defendant stems from an attempt to combine Macon-Bibb's employees with the Authority's to preserve her Title VII claims. *See, e.g.*, [Doc. 15-3 at p. 9]; [Doc. 22-2 at p. 12].

---

[15] For example, when an employer terminates an employee, and the human resources department completes the discharge paperwork you don't sue human resources, you sue *the employer*.

In some instances, a plaintiff may try to "join" two separate entities in an effort to reach the 15-employee requirement for Title VII, which "defines an employer as a 'person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." *Harvey v. UHS Pruitt Holdings Inc.*, No. 7:14-CV-54 (HL), 2016 WL 393997, at *4 (M.D. Ga. Feb. 1, 2016) (quoting 42 U.S.C. § 2000e(b)). Whether two separate entities may be joined together to surpass this requirement focuses on the degree and control Macon-Bibb had over the terms and conditions of Childs employment and her termination. *See Peppers*, 835 F.3d at 1297. As discussed in great detail for Macon-Bibb's summary judgment motion, the Court has already found that there was no evidence that Macon-Bibb exerted the control necessary to establish it and the Authority as a single employer or that it and the Authority were Childs' joint employer. Thus, in order for the Authority to be held liable for any of Childs' discrimination claims brought under Title VII, it must qualify as an "employer" under the statute's definition. *See* 42 U.S.C. § 2000e(b).

Here, Childs contends that "there is a genuine issue of material fact as to whether [the Authority] employed [15] . . . employees based on paragraph 6 of [her] affidavit." [Doc. 34-1 at pp. 7–8]. Not only has the Authority (and Bradford) moved to strike, [Doc. 36-1], Childs' affidavit on the basis that it is filled with legal conclusions and seeks to provide testimony not made on personal knowledge, there is nothing to show—even by

the contents of paragraph 6, if accepted—that the Authority can qualify as an employer under Title VII. Accordingly, Childs' Title VII claims against the Authority must be dismissed since it was not her employer. [Doc. 34-2 at ¶ 6].

Even if the Authority qualified as an employer under Title VII, Childs' claims (whether they are brought under Title VII, § 1981, or § 1983) would still fail because she cannot establish a prima facie case of race discrimination, sex discrimination, or retaliation. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (stating that "[w]here, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under [42 U.S.C. §§ 1981 and 1983], the legal elements of the claims are identical . . . [and] [the Court] need not discuss . . . Title VII claims separately" from claims brought under §§ 1981 and 1983.). Simply put, Childs cannot show she was discriminated against on the basis of her race or sex.

To establish a prima facie case for a disparate treatment claim, Childs "must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or that her employer treated similarly situated employees outside of her class more favorably." *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004). Childs' reliance on circumstantial evidence to support her discrimination claims places the analysis within the familiar burden-shifting framework set out in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Childs bears the

initial burden of establishing a prima facie case. *Id.* at 802–04. If she can establish a

prima facie case of discrimination, the burden shifts to the Authority to offer a

legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the

Authority can produce such a reason, Childs then reassumes the burden and must show

that the Authority's stated reason was a pretext for discrimination. *Id.* If Childs does not

satisfy her burden of establishing a genuine issue of material fact that the Authority's

reason was pretextual, summary judgment to the Authority is proper. *See Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.1997).

 As with most employment discrimination cases, Childs makes the argument that

the Authority treated others outside of her protected class more favorably. [Doc. 34-1 at

p. 10]. Thus, she must demonstrate that she was treated differently from another

"similarly situated" individual. *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir.

2019) (en banc). In other words, Childs must identify a valid comparator in order to

save her race and sex-based discrimination claims.

 Since *Lewis*, the Eleventh Circuit Court of Appeals requires a plaintiff's proffered

comparator to be "similarly situated in all material respects." *Id.* at 1218. While mere

differences in job title and minor differences in job activity will not disqualify a

proffered comparator, there are "sorts of similarities that will, in the main, underlie a

valid comparison." *Id.* at 1227 (first citing *Lathem v. Dep't of Children & Youth Servs.*, 172

F.3d 786, 793 (11th Cir. 1999) and then citing *Ercegovich v. Goodyear Tire & Rubber Co.*,

154 F.3d 344, 353 (6th Cir. 1998)). For instance, a valid comparator for Childs—she offers two: one for her race discrimination claim and one for her sex discrimination claim— will have engaged in the same basic conduct or misconduct; been subject to the same employment policies; will have been under the jurisdiction of the same supervisor; and will share her employment or disciplinary history. *Lewis*, 918 F.3d at 1227–28 (internal citations omitted). In short, as the "all material respects" label indicates, a valid comparison doesn't turn on formal labels, but rather on substantive likenesses and whether Childs and her comparators are, in an objective sense, substantially similar in that they "cannot reasonably be distinguished." *Id.* at 1228 (citing *Young v. United Parcel Serv. Inc.*, 135 S. Ct. 1338, 1355 (2015)).

Here, the facts undoubtedly show that Childs can meet three out of the four prongs that comprise a prima facie case—she is an African-American female who was terminated from a job for which she was qualified.[16] However, she cannot show that she "was replaced by someone outside of her protected class or that her employer treated similarly situated employees outside of her class more favorably." *Cuddeback*, 381 F.3d at 1235.

In briefing, Childs maintains that she "was replaced by a white female and a white male." [Doc. 34-1 at p. 8 (citing [Doc. 17, Childs Depo., pp. 32:1—33:25])].

---

[16] Bradford, Childs' supervisor, testified that there were no problems with Childs' performance prior to the date she was terminated and that she was a "good employee." [Doc. 20, Bradford Depo., pp. 14:1– 14:3, 14:20—15:15].

However, upon closer inspection of her deposition testimony, exactly who replaced Childs—by her own account—is near impossible to discern. During her deposition, Childs stated that "since [she] left," the Authority hired six people: an older white female to help Bradford; a black female named Jasmine Gainey, who, according to Childs served as a receptionist; a white male named Tyler Garrison who was "hired in one of [her] duties as Project Manager"; a young black female who worked in economic development; a young white female who used to work for the Cherry Blossom Festival; and a black female named Lillie Battle who replaced Gainey. [Doc. 17, Childs Depo., pp. 32:13—34:10])]; [Doc. 22-1 at ¶ 84].

Bradford, however, stated in her verified response to Childs' interrogatories, that Gainey and Battle "applied for and . . . [were] selected to fill the position" from which Childs was terminated. [Doc. 20, Bradford Depo., p. 104]. Both of these women are African American females. [*Id.*]. Childs, of course, denies this statement in her Response to the Authority's and Bradford's Statement of Material Facts. *See* [Doc. 22-1 at ¶ 85] *in connection with* [Doc. 34-3 at ¶ 85]. However, that is all she does, she just denies it, and blanket denials (as Childs has done many, many times in this case) are not permitted under the Court's local rules or the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c), (e)(2); *see also* LR 56, MDGa. Her failure to point to specific citations in the record leaves the Court with one option—to deem the Authority's and Bradford's factual allegation as admitted. *See* n.2, *supra*.

To the extent Childs attempts to explain that her job duties were split among Adams, Garrison, and Gainey in an effort to defeat summary judgment on the grounds that Adams and Garrison—two white men—could have replaced her, Childs herself doesn't even know if this is true. [Doc. 17, Childs Depo., p. 33:20–23]. She states, "I believe . . . Garrison, and I believe . . . Adams had some of my duties - - *I'm not quite sure* - - and [Gainey]." [*Id.*] (emphasis added). This, this is the quintessential example for summary judgment motions where the nonmoving party's rebuttal evidence—Childs' evidence—is "merely colorable" or "not significantly probative of a disputed fact." *Josendis*, 662 F.3d at 1315. This "mere scintilla of evidence"—that Childs is "not quite sure" whether a black person or a white person replaced her after she was fired "will not suffice" and cannot support her position in her brief that she "was replaced by a white female and a white male." *Allen*, 121 F.3d at 646; [Doc. 34-1 at p. 8]. Because of how Childs chose to respond to the Authority's and Bradford's Statement of Material Facts, the evidence in this case is that she was replaced by Gainey, a black female, who

was in turn followed by Battle, another black female. Thus, she cannot satisfy the fourth prong of her prima facie case.[17]

Not only has Childs failed to show that she was replaced by someone outside of her protected class, she cannot show that she was treated less favorably than someone outside of her class. In an attempt to show disparate treatment, Childs proffers two individuals as her comparators: Stephen Adams, who was Project Manager, and Marlon Baldwin, who was an assistant finance manager. [Doc. 22-1 at ¶ 5]; [Doc. 17, Childs Depo., pp. 11:24—12:8, 18:22—19:4, 73:25—74:14]. Despite Childs' contention that both Adams and Baldwin received disciplinary reprimands for failure to follow instructions rather than termination, neither is a valid comparator.

As for Adams, Childs states he received "prior corrective action for work performance but not fired." [Doc. 17, Childs Depo., p. 63:20–22]. According to Childs,

---

[17] Citing to *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984), Childs argues that "the fact that a black [p]laintiff was replaced by a black person does not foreclose a finding of discrimination." [Doc. 34-1 at p. 9]. Other than pointing this case out to the Court and alluding to situations where "the mere hiring of a black [person] after alleged discrimination against another" may be "a pretextual device specifically designed to disguise an act of discrimination," Childs makes absolutely no argument that this is the case here, and the Court will not invent or concoct arguments for her. [*Id.* (citing *Ratliff v. Governor's Hwy. Safety Program*, 791 F.2d 394, 402 (5th Cir. 1986))]. It is not the district court's job, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) (citation omitted). Even if this were the case here, Childs' own argument is fatal to the point she attempts to make. The Authority replaced Childs with Gainey and then Battle; however, there is nothing to show that the decision to hire these two African-American women came *after* Childs alleged discrimination claims. *See* [Doc. 1-2 at p. 1 (showing that Childs filed her Charge of Discrimination on November 19, 2017)]. The evidence simply doesn't tell the Court exactly when the Authority hired Gainey or Battle. Thus, there is nothing to show that the Authority made its post-Childs hiring decisions to disguise any act of discrimination. And finally, the Authority's decision to hire Gainey and Battle after it terminated Childs and after Whitby resigned, belies any allegation that the Authority only wanted to hire "lily white" employees. [Doc. 17, Childs Depo., pp. 31:3—34:10].

Adams "acted on behalf of the . . . Authority when he shouldn't [have] for a company to come to Macon." [*Id.* at p. 64:13–15]. While others like "[Brown] would know for sure," Childs further contends that Adams "had a lot of disciplinary actions[,]" including a demotion from Director of Operations back to his original position of Project Manager. [*Id.* at p. 65:20—66:2]; [Doc. 24, Adams Depo., p. 28:18–21]. However, Childs' position and Adams' position are not comparable, they are not—to put it in *Lewis*'s terms—substantially similar, because they *can* "reasonably be distinguished." 918 F.3d at 1228. Childs has acknowledged that Adams' duties, as Project Manager, required him to be "out in the field[,]" while she was inside in an administrative capacity. [Doc. 17, Childs Depo., pp. 14:20—15:2]. Yes, Childs later received a promotion (from Administrative Assistant to Administrative Coordinator) that placed her in more of an outside role. [*Id.* at p. 17:14–15]. However, other than assisting Adams with requests for information (presumably for business that were coming to Macon) and taking notes, her duties still remained categorically administrative in that she did not "have a role in respect to prospects of businesses that [the Authority was] trying to get to come to Macon." [*Id.* at pp. 17:18—18:5]; [Doc. 22-1 at ¶ 16]. In other words, by looking at Childs' deposition testimony, her job duties did not give her a voice on whether a company came to Macon, Georgia.

Most importantly, however, for this comparator analysis, is the fact that Adams did not commit the same misconduct as Childs. As stated above, *Lewis* tells us that a

similarly situated comparator will have engaged in the same basic misconduct as the plaintiff. 918 F.3d at 1227–28. Here, that simply didn't happen. Adams' misconduct was (for lack of better words) speaking on behalf of the Authority . . . without the authority to do so. [Doc. 17, Childs Depo., p. 64:13–15]. Childs, on the other hand, violated the confidentially of the executive session by listening to a recording regarding personnel discussions about *herself*. [*Id.* at pp. 53:23—54:1, 57:5–17]. While Adams, as one of Childs' proffered comparators, does not have to be identical, he must be substantially similar to the point that he "cannot reasonably be distinguished." *Lewis*, 918 F.3d at 1227–28. And substantially similar he is not. Not only can Childs' and Adams' job duties be reasonably distinguished, it is clear that they did not engage in the same basic misconduct. *Id.*

Now, as for Baldwin, he, like Childs, is also African American, so his status as a comparator lends more to her sex discrimination claim. [Doc. 17, Childs Depo., 67:3–12]. However, Baldwin was the Assistant Finance Director and, unlike Childs, helped with bonds. [*Id.* at pp. 19:3–4, 22:12–17]. So, his duties were not at all similar to her administrative duties. To further her comparator analysis, Childs testifies that there was corrective action taken against Baldwin (as opposed to termination) for failure to follow instructions; however, she does not identify what instructions he failed to follow. [*Id.* at p. 67:3–12]. As with Adams, Childs fails to show that Baldwin, during his time with the Authority, violated the confidentiality of the executive session by listening to minutes

regarding personnel discussions after being instructed to leave the room. Since Adams'
and Baldwin's job duties can be reasonably distinguished from Childs' duties, she failed
to meet her burden of pointing to similarly situated comparators who were treated
more favorably. And without a prima facie case, no inference of discrimination arises.

Even if Childs could show that the Authority treated a valid comparator outside
of her protected class more favorably, she cannot show that the Authority's reason for
terminating her was pretext for either race or sex discrimination. Childs admittedly
violated the confidentiality of the executive session. Yes, Whitby (during his tenure as
Chair) may have allowed her to listen to the executive session recording in order to take
minutes; however, Whitby had just resigned. This particular meeting was the first
meeting after his resignation and given the sensitive nature of the discussions, Childs
and others were excused from the meeting. After the meeting's return to open session
and its conclusion, Brown told Childs to leave the tape recorder with him. However,
Childs, "under the guise of clearing the table," took the recording. [Doc. 22-2 at p. 17].
Then, not moments later Brown caught her listening to it, and Childs new she had done
something she wasn't supposed to, because she panickily told Brown, "I only listened to
[two] seconds. I only listened to [two] seconds." [Doc. 17, Childs Depo., p. 52:13–18].
Whitby, the Authority's Chair and Executive Director, had just been indicted, and "[t]he
need for trust [and confidentiality] was understandably heightened." [Doc. 22-2 at p.
19]; [Doc. 22-1 at ¶ 21]. That is why Brown told Childs to leave the recording with him,

but because Childs was a "good employee," he allowed her to take the recorder and trusted her not to listen to its contents, but in the end "[she] violated that trust." [Doc. 22-2 at p. 19]; [Doc. 20, Bradford Depo., p. 15:14]. This violation is clearly a legitimate non-discriminatory reason for termination and the evidence in this case simply raises no inference that race or sex motivated[18] Childs' termination. *See* [Doc. 34-1 at p. 9].

### 3.   Childs' Retaliation Claim Against the Authority and Bradford

Lastly, Childs' termination was not the result of retaliation. "A plaintiff alleging retaliation in violation of Title VII 'must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)). "These three elements create a presumption that the adverse action was the product of an intent to retaliate." *Id.* (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)).

---

[18] It must be remembered that courts do not sit as super personnel departments to review or implement change to an employer's business judgments. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361 (1995) ("Title VII[ ] is not a general regulation of the workplace but a law which prohibits discrimination. [Title VII] does not constrain employers from exercising significant other prerogatives and discretions in the course of hiring, promoting, and discharging of their employees."). As unjust as it may seem to an employee, an employer may fire its employee for any reason, as long as that reason is not discriminatory. Whether the employer made a wise or unwise decision is irrelevant to the Court. All that matters is that the employer's "decisions were not made with discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

Once a presumption of retaliation is established, the burden shifts to the

defendant to rebut the presumption by articulating a legitimate, non-retaliatory reason

for "the challenged employment action." *Id.* at 1244–45 (first citing *Bryant*, 575 F.3d at

1308 and then citing *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en

banc)). At this stage, the defendant's "burden is merely one of production; it need not

persuade the court that it was actually motivated by the proffered reasons. It is

sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

retaliated against the plaintiff." *Id.* at 1245 (quoting *Combs v. Plantation Patterns*, 106 F.3d

1519, 1528 (11th Cir. 1997)).

If the defendant has "met its burden of production and has proffered a

legitimate, [non-retaliatory] reason for the adverse action," the presumption of

retaliation is eliminated. *Knox*, 957 F.3d at 1245 (citing *Chapman*, 229 F.3d at 1024). Then,

the plaintiff must "come forward with evidence allowing a reasonable factfinder to

conclude that the proffered reason was pretextual." *Id.* "The plaintiff must 'come

forward with evidence, including the previously produced evidence establishing the

prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons

given by the employer were not the real reasons for the adverse employment decision.'"

*Id.* (quoting *Combs*, 106 F.3d at 1528). "In determining whether a proffered reason is

unworthy of credence, a court will consider 'weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.'" *Id.*

Here, Childs claims that she "was terminated less than a month after she rebuffed Fountain" and his alleged unwelcome sexual advances. [Doc. 34-1 at p. 18]. Childs testified that she reported these allegations to Whitby and Bradford. [Doc. 17, Childs Depo., pp. 34:11—35:25]. However, Fountain vehemently denies ever making any such advances. [Fountain Depo., pp. 12:21—13:24]; [Doc. 22-1 at ¶ 66]. As for reporting these allegations, Childs claims that she reported them to Bradford and Whitby "at the same time." [Doc. 17, Childs Depo., pp. 34:11—35:9]. However, Whitby's account is a little different. Whitby testified that he overheard "Childs  . . . sharing with . . . Bradford that she felt uncomfortable around [Fountain]." [Doc. 19, Whitby Depo., p. 24:9–15]. Feeling that their conversation was for "two women," Whitby "moved on." [*Id.* at p. 24:15–16]. Other than discussing Childs' uncomfortable feelings with Bradford, Whitby testified that he did not "get any more particulars about what made [Childs] feel uncomfortable." [*Id.* at pp. 24:16—25:4]. In fact, Whitby never even received an official complaint from either Childs or Bradford. [*Id.* at p. 25:4–6 (". . . [I]f you're asking me did I get a [*sic*] official complaint from Ms. Bradford or Ms. Childs, the answer is no.")].

Piecing the testimony together, it appears that Whitby never knew the specifics about Fountain's alleged sexual misconduct. [*Id.*]. Had Childs complained of the events

she mentioned during her deposition, Bradford stated that she would not have addressed the allegations with Fountain, directly, but would have reported Fountain's alleged actions to Whitby. [Doc. 20, Bradford Depo., pp. 17:16—20:22]. So, the only person Whitby spoke with about Childs feeling uncomfortable around Fountain was Bradford. When considering all of this testimony, it leads to an interesting point—there is no evidence that Fountain ever knew that Childs mentioned his alleged sexual misconduct to either Whitby or Bradford. Therefore, Fountain could not have retaliated against Childs for something he knew nothing about. What's more, Childs, immediately after her termination, drafted a "Reason for Termination Statement," and in it, she never mentions something as severe as sexual harassment. [Doc. 17, Childs Depo., pp. 168–70].

Certainly, reporting allegations of sexual harassment is a protected activity. And, of course, Childs can show that the Authority terminated her. However, she cannot show that her termination was casually related to her allegations regarding Fountain. Fountain never knew about Childs' complaint of sexual misconduct; however, he did know that she violated the confidentiality of executive session and *that* is why he fired her—a legitimate non-discriminatory reason completely removed from the basis of race or sex.

### 4.      Childs' State-Law Claims Against the Authority and Bradford

Having disposed of Childs' discrimination claims, all that is left for

determination is her state-law claims for race and sex discrimination and retaliation in

violation of the Georgia Constitution; tortious interference with employment

relationship;[19] intentional infliction of emotional distress;[20] and false imprisonment.[21]

[Doc. 1 at ¶¶ 30–41]. With respect to the Authority, these claims are barred by sovereign

---

[19] Notwithstanding the application of sovereign immunity, Childs' state-law claim for tortious interference with employment relationship against the Authority and Bradford in her individual capacity fails. *Batayias v. Kerr-McGee Corp.*, 601 S.E.2d 174, 176 (Ga. Ct. App. 2004) (citation omitted) ("In an action for tortious interference with an employment relationship that is terminable at will, the plaintiff must show that a party with no authority to discharge the employee, being activated by an unlawful scheme or purpose to injure and damage him, maliciously and unlawfully persuades the employer to breach the contract with the employee.").

[20] Likewise, Childs' claim of intentional infliction of emotional distress (asserted against the Authority and Bradford in her individual capacity) is wholly without merit under the facts of this case. "The mere termination of employment does not authorize a recovery for intentional infliction of emotional distress. In order to sustain a cause of action, the defendant's actions must have been so terrifying as naturally to humiliate, embarrass or frighten the plaintiff." *Kitfiled v. Henderson, Black & Green*, 498 S.E.2d 537, 542 (Ga. Ct. App. 1998) (citations omitted).

[21] Finally, Childs' claim for false imprisonment against Bradford as an individual and the Authority cannot stand. Under Georgia law,

> [i]t is essential . . . that the restraint be against the plaintiff's will; and if [she] agrees of [her] own free choice to surrender [her] freedom of motion, as by remaining in a room or accompanying the defendant voluntarily, to clear [herself] of suspicion or to accommodate the desires of another, rather than yielding to the constraint of a threat, then there is no imprisonment.

*J.H. Harvey Co. v. Speight*, 344 S.E.2d 701, 702 (Ga. Ct. App. 1986). The testimony from Childs' deposition makes clear that no one at the Authority used force or fear to restrain her. *See, e.g.*, [Doc. 17, Childs Depo., pp. 57:24—58:22]. Brown asked Childs to remain in Bradford's office after Fountain made the decision to terminate her because he (Brown) didn't want a reporter to see her "crying hysterically." [*Id.* at p. 58:2–6]. Not once does Childs testify that Brown or anyone from the Authority used force or fear to restrain her. Sure, she states that "[Fountain and Brown] are two men," alluding to the notion that she couldn't "fight them off," but at the end of the day, Childs herself made the decision to "just [sit] there." [*Id.* at p. 58:17–22]. Thus, there is no false imprisonment claim here.

immunity, and as for the state-law claims asserted against Bradford individually, they fail as a matter of law. *See* nn.18–20.

When Bibb County, Georgia, and the City of Macon consolidated, the newly-formed municipal-county government "elected to be treated as a county for sovereign immunity purposes." [Doc. 22-2 at p. 19 (citing H.B. 1171 § 2(j), 151st Gen. Assemb., Reg. Sess. (Ga. 2012) ("The tort and nuisance liability of the restructured government shall follow the law and rules of tort liability applicable to counties in Georgia.")). Thus, as an instrumentality of Macon-Bibb County, the Authority enjoys sovereign immunity, because Macon-Bibb County has not waived its immunity for the claims Childs asserts. *Woodard v. Laurens Cty.*, 456 S.E.2d 581, 582–83 (Ga. 1995) (citations omitted) (noting that the Georgia General Assembly's waiver of sovereign immunity under the Georgia Tort Claims Act does not extend to counties).

## CONCLUSION

Based on all of the foregoing, it is clear that Fountain (on the advice of counsel) terminated Childs for violating confidentiality. Childs failed to present the all-important similarly situated comparator who committed the same misconduct but was not terminated. Accordingly, she failed to create a prima facie case of race or sex discrimination or retaliation. For this and the other reasons discussed above, the Court **GRANTS** Defendant Macon-Bibb County's Motion for Summary Judgment [Doc. 15]

and Macon-Bibb County Industrial Authority's and LeVarn Bradford's[22] Motion for Summary Judgment [Doc. 22]. The Clerk of Court is **DIRECTED** to enter Judgment accordingly and **CLOSE** this case.

      **SO ORDERED**, this 12th day of June, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[22] Without ruling on the merits of Defendant Macon-Bibb County Industrial Authority's and Bradford's Motion to Strike [Doc. 36], and in an effort to give the Childs the benefit of all doubt as the nonmovant, the Court **DENIES** their Motion **as moot**. Even considering Childs' testimony from her affidavit, the outcome of this case remains unchanged because many of her comments directly controvert her deposition testimony. *See, e.g.,* [Doc. 34-2 at ¶ 9]. And, as previously discussed, a party cannot produce a subsequent affidavit without explanation that directly contradicts previously given testimony to survive summary judgment. *See* n.7, *supra.*